UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
MSC MEDITERRANEAN SHIPPING COMPANY S.A.,  :
                                                                        :
                                    Plaintiff,                          :
                                                                        :        18 Civ. 10788 (JPC) (OTW)
                    -v-                                                  :
                                                                        :        FINDINGS OF FACT AND
AIRLIFT MARINE SERVICES PVT LTD. and                                    :        CONCLUSIONS OF LAW
AIRLIFT (U.S.A.), INC.,                                                 :
                                                                        :
                                    Defendants.                         :
                                                                        :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

On May 13, 2015, Brian Diver was seriously injured at work when a bundle of large granite slabs crushed him as he unloaded a shipping container.  Diver filed suit in New Jersey state court against several entities involved in the transportation of that cargo, including Plaintiff MSC Mediterranean Shipping Company S.A. ("MSC"), the carrier that transported the container across the Atlantic Ocean.  MSC later settled with Diver, and now seeks indemnification from the company that arranged for its trans-Atlantic carriage, Defendant Airlift (U.S.A.) Inc. ("Airlift USA").  Following a bench trial on written submission, the Court finds that MSC's bill of lading with Airlift USA requires indemnification under these circumstances, and awards MSC $888,682.81 in damages, including attorneys' fees and disbursements from the New Jersey litigation, plus prejudgment interest in the amount of $44,392.03.

## I.  Findings of Fact

"In an action tried on the facts without a jury," the Court "find[s] the facts specially and state[s] its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  "As with any civil case, the

plaintiff bears the burden of proving the elements of [the plaintiff's] claim by a preponderance of the evidence. . . .  [I]t is within the province of the district court as the trier of fact to decide which testimony should be credited."  *Wilson v. Calderon*, 367 F. Supp. 3d 192, 195-96 (S.D.N.Y. 2019) (internal quotations and citations omitted).

## A.  The Container's Journey

MSC is an "ocean common carrier of cargo," while Airlift USA is a "non-vessel-operating common carrier," or NVOCC.  Dkt. 116 ("Stipulated Facts") ¶¶ 1-2.  An NVOCC acts as a middleman between shippers and ocean common carriers "that arrange[s] for shippers the transportation of cargo aboard a vessel."  *Scholastic Inc. v. M/V Kitano*, 362 F. Supp. 2d 449, 456 (S.D.N.Y. 2005).  "In a run-of-the-mill shipping transaction, the actual shipper will arrange for the shipment of good through an NVOCC, who will issue its own 'house' bill of lading to its customer [*i.e.*, the shipper].  The NVOCC will arrange for the shipment of goods with a steamship line . . . who will issue a bill of lading covering the goods shipped."  *Fubon Ins. Co. Ltd. v. OHL Int'l*, No. 12 Civ. 5035 (RJS), 2014 WL 1383604, at *2 (S.D.N.Y. Mar. 31, 2014) (citation omitted).  "A 'bill of lading' is the primary contractual document between a shipper and a carrier."  *Laufer Grp. Int'l v. Standard Furniture Mfg. Co.*, No. 19 Civ. 10885 (JPO), 2020 WL 4735123, at *3 n.1 (S.D.N.Y. Aug. 14, 2020).

Pacific Granite (India) sold granite slabs to Pacific Granite Inc., which resold them to Elite Stone Importers, an importer and distributor of granite and marble in Tinton Falls, New Jersey. Stipulated Facts ¶ 22; R. 566.[1]  On April 11, 2015, Airlift USA issued a bill of lading for the transit

---

[1] The briefing and evidence contain minor inconsistencies as to these entities' names.  The Court uses herein the names used by the parties in the Stipulated Facts.

of those slabs from Mundra, India to New York.  R. 39.[2]  The Shipper is listed as Pacific Granite (India), the Consignee as Pacific Granite Inc., and the Notify Party as Elite Stone Importers.  *Id.*

At the time of the shipment, Airlift USA had a service contract with MSC.  Stipulated Facts ¶ 23.  That service contract provides that "shipments made hereunder shall be subject . . . to the terms and conditions of MSC's bill of lading, and all said provisions are hereby incorporated in this Contract by reference."  R. 34.  On April 12, 2015, MSC issued a bill of lading (the "Bill of Lading") for trans-Atlantic carriage of the granite slabs from Mundra to New York City.  Stipulated Facts ¶ 15; R. 16.  The Bill of Lading lists Defendant Airlift Marine Services PVT Ltd. ("Airlift Marine") of Chennai, India as the Shipper and Airlift USA as both the Consignee and the Notify Party.  R. 16.  The Bill of Lading further describes the items to be shipped as eight packages of "polished [and] leathered random slabs," with a "shipped on board date" of April 12, 2015.  *Id.* (capitalization changed).

To protect the granite slabs during transportation and to facilitate their handling, Pacific Granite (India) packed the slabs into wooden bundles before placing them in a container sub-leased to MSC.  Stipulated Facts ¶¶ 19, 22.  Under the sub-lease, MSC was responsible for the maintenance and repair of the container.  *Id.* ¶ 20.  After the ocean journey on MSC's vessel, G&G Transport Services, a transportation company hired by Elite Stone Importers, delivered the container of slabs by truck from the port in New York City to Elite Stone Importers's facility in Tinton Falls, New Jersey.  *Id.* ¶ 18.  Airlift USA, as the NVOCC, never took physical possession of the cargo or its container.  *Id.* ¶ 17.

---

[2] Citations to "R." are to exhibits that the parties jointly submitted to the Court on March 19, 2021.  Neither party has objected to the admissibility of any of those exhibits.

Brian Diver had worked for Elite Stone Importers since 2011, and his duties included unpacking cargo from arriving containers.  R. 259.  On May 13, 2015, following G&G Transport Services's delivery of the container of granite slabs to the Tinton Falls facility, Diver began to unpack the container.  Stipulated Facts ¶ 3; R. 130-31.  As he inspected some of the slabs in the container, one of the bundles toppled, crushing him.  R. 131, 175-76.  Diver was trapped underneath the granite slabs for approximately five hours and had to be extracted on a stretcher through a hole cut into the side of the container, with assistance from a local hospital's trauma team.  R. 190-91.  He suffered serious injuries to his face, right arm, and other parts of his body. R. 922.

**B.  The Cause of the Accident**

During discovery in the New Jersey litigation, three primary theories of causation for Diver's injuries were explored:  (1) poor packing of the bundles of slabs, (2) a defect in the floor of the shipping container, and (3) an unstable chassis[3] supporting the shipping container.  The Court runs through the evidence supporting each theory in turn.

Diver repeatedly testified at his two depositions that the slabs in the container were poorly packed.  *See, e.g.,* R. 132 (The bundle came from "India . . . [a]nd not one of our better packing India [sic].");  R. 136 ("[T]his was a poorly packed container.");  R. 140 (When inspecting the container, "I noticed how poorly packed this really was.");  R. 142 (When considering which bundle to take out first, "I recall thinking . . . they're all that bad [*i.e.*, poorly packed].");  R. 228 (The container was "in the . . . top 10 or 15" "most poorly packed container[s]" Diver had ever

---

[3] "A chassis is the wheeled support frame used to transport the container overland.  In other words, a chassis is what most lay persons would call the 'trailer' portion of a tractor/trailer rig, while the container is the load-carrying metal box that sits upon it."  *Atl. Container Serv., Inc. v. Coleman*, 904 F.2d 611, 612 (11th Cir. 1990).

unloaded.).  The packing flaws that Diver noticed included mismatched nuts and bolts clinching the dunnage together, a nail insufficiently hammered to secure its board, and a joint that was not properly toe-nailed, which is a technique used to stabilize boards.  R. 301-02.  Diver commented that "[i]t seem[ed] whoever was packing this was never trained in any way, shape or form to use tools."  R. 302.  Diver explained that such loose, unsecured packing is dangerous:  "[I]f the [slabs] were cinched tight together and they're flat on the bottom, as long as everything is held together, they should stand up straight and stay that way.  When they're loose, any little jiggle and they can go either way; left, right."  R. 305-06.  Following his usual practice of documenting concerns to protect Elite Stone Importers in the event of damage or a dispute, Diver photographed what he considered to be defective packing before starting to unload.  R. 283-84, 301-02, 307-08.

Both Diver and MSC retained expert witnesses in the New Jersey litigation to opine on the packing of the granite slabs.  Diver retained Dr. Sher Paul Singh, a Professor Emeritus of Packaging at Michigan State University with experience consulting on packaging, transportation, and material handling.  R. 932-39.  Dr. Singh opined that the "loads had a high degree of instability" and "were neither properly packaged nor secured . . . [in compliance with] federal and international regulations [and] . . . industry practices in the United States."  R. 933-34.  He explained that the granite was shipped vertically and with "clamping mechanism[s] of wood and metal," rather than in crates, which resulted in "top-heavy . . . and extremely unstable loads."  R. 955-56, 963.

MSC retained Captain Philip I. Anderson, the Chief of the Technical Department at the National Cargo Bureau.  R. 1057.  Captain Anderson agreed with Dr. Singh that "the packaging was deficient . . . because of [its] loose components" and was not compliant with recognized standards.  R. 1066.  According to Captain Anderson, the slabs' poor packing and high center of

gravity gave them "a tendency . . . to lean," and thus made them "likely to collapse and topple with minimal disturbance." *Id.* He claimed, though, and contrary to Dr. Singh, that the general packing method the shipper used is common, albeit poorly applied in this case, which "resulted in the creation of loose, unstable[] bundles." R. 1071.

Diver also testified that the floor of the shipping containers had "[p]lywood patches," "uneven edges at the seams, [and] uneven height on the edges of the seams." R. 162. Diver recalled that as he approached the bundles inside the shipping container, "the floor was a bit spongy," and stepping on it "caused the wood that was supporting" the bundles to fall. R. 131; *see also* R. 287-88 (explaining that by "spongy," Diver meant "[b]ouncy" due to poor fastening). In other words, "stepping too close" to the bundle "bounced [it] or something." R. 131; *see also* R. 175 (describing his suspicion, "[w]ith[out] 100 percent certainty," that "[s]tepping on the spongy floor released enough pressure to make the wood come out").

Dr. Singh reached a similar conclusion. Dr. Singh understood that "multiple pieces of wood were simply placed on the floor" and "nail[ed]," which "can create[] uneven joints throughout the container." R. 1012. He opined that the floor of the shipping container was repaired in a manner that caused the floor to be uneven, which does not meet industry standards and, in turn, "create[s] problems of instability to loads that are top-heavy." R. 1015. Dr. Singh further determined that this uneven flooring caused the accident. *Id.*

Captain Anderson disagreed. After viewing photographs, Captain Anderson opined that the boards were "properly attached to the floor" and that "[a]ny residual unevenness was within [industry] tolerances." R. 1076. Captain Anderson also disputed many of Dr. Singh's statements about standards for the inspection and testing of shipping containers under applicable guidelines. R. 1073-76. Stephen Dines, the Director of Maintenance and Repair for MSC's American

operations, R. 362, likewise maintained at his deposition that the container was suitable for the slabs, R. 438-39.  The container also passed an inspection in India on March 26, 2015, before its journey to New York.  R. 482.

Finally, Diver testified that when the container was partially unloaded with two bundles of granite remaining, "the landing gear on one side of the chassis" with the bundles gave way.  R. 164.  That landing gear consisted of "stabilizer[] legs that . . . hold the trailer flat" if the truck is uncoupled from the trailer.  R. 165.  When the landing gear gave way, the chassis leaned to the right, and "both bundles kick[ed] against the wall."  R. 167.  Diver then exited the forklift, "lift[ed] up the side of the chassis to reset the landing gear," attempted to provide support to prevent it from falling again, and observed "that both bundles had come back to near plumb."  R. 167-68; *see also* R. 293-94.  While Diver testified that he did not believe that the issue with the chassis caused the accident, *see* R. 177, he speculated that the movement of the bundles may have aggravated the bundles' instability due to their poor packing, R. 296-97.  Captain Anderson agreed that the poor packing was likely exacerbated by the collapse and subsequent reset of the chassis landing gear.  R. 1068, 1078.[4]

## C.  The New Jersey Litigation

Diver filed suit for his injuries in New Jersey state court on April 17, 2017.  Stipulated Facts ¶ 3.  The defendants in that litigation eventually included, among others, MSC, Airlift USA, Airlift Marine, Elite Stone Importers, G&G Transport Solutions, Pacific Granite Inc., and Pacific

---

[4] Captain Anderson also suggested an explanation that no party offers in this litigation: user error by Diver.  Captain Anderson testified that Diver failed to follow safety protocols by operating within the "fall shadow" of slabs that he knew were not properly secured.  R. 1078.  Captain Anderson also believed that the accident could have been prevented by using ropes or straps to restrain the slabs and prevent them from tipping.  R. 1069, 1078.  Elite Stone Importers did not use that method at the time of the accident but has since implemented it.  R. 1069.

Granite (India).  *Id.* ¶¶ 3-8.  By March 2020, following defaults, motion practice, and voluntary dismissals, three defendants remained:  MSC, Airlift USA, and Pacific Granite Inc.  *Id.* ¶ 14. Airlift USA's counsel attended depositions and received all documents produced in discovery.  *Id.* ¶ 12.

On March 5, 2020, MSC and Pacific Granite Inc. reached a proposed settlement with Diver, which entailed MSC paying Diver $730,000 and Pacific Granite Inc. paying Diver $20,000.  *Id.* ¶ 25.  MSC also agreed to make a $25,000 side payment to Diver's workers' compensation carrier. *Id.*  At the time of the settlement, MSC had already commenced this indemnity action against Airlift USA and Airlift Marine in federal court.  R. 1164.

Also on March 5, 2020, MSC demanded that Airlift USA and Airlift Marine either approve the settlement or take over MSC's defense.  Stipulated Facts ¶ 28.  Airlift USA refused to do either, while Airlift Marine did not respond.  *Id.* ¶¶ 30-31.  Much like its current defense in this litigation, Airlift USA maintained that it did not owe any indemnity obligation to MSC for Diver's claim.  R. 1171.  It further argued that MSC's potential liability was due to its flawed litigation strategy, including failing to move for summary judgment, to depose Dr. Singh, and to offer a witness at a nonbinding arbitration.  *Id.*  On April 17, 2020, MSC paid $730,000 to Diver's counsel, and on July 1, 2020, MSC paid $25,000 to Diver's worker's compensation carrier.  Stipulated Facts ¶¶ 32-33.

## D.  The Bill of Lading

The question of whether Airlift USA must indemnify MSC turns largely on its obligations under the Bill of Lading between MSC and Airlift USA.  The front of the Bill of Lading states that "in accepting this Bill of Lading, the Merchant expressly accepts and agrees to all the terms and conditions . . . on this side and on the reverse side of this Bill of Lading."  R. 16 (capitalization

changed).  Merchants for purposes of the Bill of Lading include the Consignee, R. 20, which is

listed as Airlift USA, R. 16.  The Bill of Lading identifies MSC as the Carrier.  *Id.*

Two clauses in the Bill of Lading's terms and conditions are particularly relevant to this

dispute.  First, clause 11 reads, in relevant part:

If a Container has not been packed by or on behalf of the Carrier . . .

11.2.  The Carrier shall not be liable for loss of or damage to the Goods[5] caused by:

(a) the manner in which the Goods have been packed, stowed, stuffed or secured in the Container, . . . .

11.4.  The Merchant shall indemnify the Carrier against any loss, damage, liability or expense whatsoever and howsoever arising caused by one or more of the matters referred to in clause 11.2, including but not limited to damage to Container, other cargo and the Vessel.

R. 26-27.  Second, clause 14.3 reads:

The Merchant warrants to the Carrier that the particulars relating to the Goods as set out on the front hereof have been checked by or on behalf of the Merchant on receipt of this Bill of Lading and that such particulars, and any other particulars furnished by or on behalf of the Merchant, are adequate and correct.  The Merchant warrants that the Goods are safely and securely packed in the Container.

R. 28.

**E.  The Federal Litigation**

MSC filed this action against Airlift USA and Airlift Marine on November 19, 2018.

Dkt. 1 ("Complaint").  MSC sought a declaratory judgment that the defendants were obligated to

indemnify MSC for MSC's potential liability, costs, and attorneys' fees in the then-ongoing New

---

[5] The Bill of Lading defines "Goods" as including "the whole or any part of the cargo carried under this Bill of Lading, including any packing or packaging materials and Merchant owned or leased Containers."  R. 20.

Jersey litigation. *Id.* at 5. On September 29, 2020, the case was reassigned from the Honorable Ronnie Abrams to the undersigned.

On March 13, 2020, the Honorable Ona T. Wang, to whom this case was assigned for general pretrial supervision, permitted Airlift Marine's attorney to withdraw and advised Airlift Marine that corporations cannot proceed *pro se*. Dkt. 70 at 2-3. Judge Wang directed Airlift Marine to retain new counsel and have that counsel file a notice of appearance by April 10, 2020, further warning that failure to do so may result in a default judgment. *Id.* at 3. Airlift Marine never retained new counsel, however. On December 2, 2020, Judge Wang issued a Report and Recommendation recommending that Airlift Marine's answer be struck and that a certificate of default be issued. Dkt. 88. The undersigned adopted Judge Wang's Report and Recommendation on January 11, 2021, Dkt. 93, and the Clerk of Court issued a certificate of default as to Airlift Marine on January 12, 2021, Dkt. 95.[6]

At conferences on November 23, 2020 and January 28, 2021, MSC and Airlift USA requested a bench trial to be decided on written submissions. On March 10, 2021, the parties submitted their joint Stipulated Facts and trial exhibits, and MSC submitted a declaration from its attorney, Randolph Donatelli ("Donatelli Decl."). On March 19, 2021, both MSC and Airlift USA submitted proposed findings of fact and conclusions of law and lead trial briefs. *See* Dkts. 102 ("Pl. Proposals"), 103 ("Pl. Br."), 104 ("Deft. Br."), 105 ("Deft. Proposals"). On June 11, 2021, the parties filed reply trial briefs. *See* Dkts. 114 ("Deft. Reply"), 115 ("Pl. Reply").

---

[6] MSC has not yet moved for default judgment against Airlift Marine.

## II.  Conclusions of Law

### A.  Legal Standard

Because this case largely turns on whether the Bill of Lading requires indemnification, the Court begins by summarizing certain legal concepts governing bills of lading and indemnity.  Bills of lading "are maritime contracts because their primary objective is to accomplish the transportation of goods by sea."  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24 (2004).  As such, federal law governs unless the contract's interpretation "so implicate[s] local interests as to beckon interpretation by state law."  *Id.* at 27.  Neither party argues that such a local interest exists here, and both agree that applying federal maritime law is appropriate.  *See* Pl. Proposals ¶ 70; Deft. Proposals ¶ 94.

"[C]ontracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties."  *Norfolk S. Ry. Co.*, 543 U.S. at 31; *see also APL Co. Pte. Ltd. v. Kemira Water Solutions, Inc.*, 890 F. Supp. 2d 360, 366 (S.D.N.Y. 2012) (looking to federal "common law principles of contract formation and interpretation" (citation and internal quotation marks omitted)).  The Court must "construe contract language most strongly against its drafter," but "only . . . where the contract is ambiguous—where it is susceptible of two reasonable and practical interpretations."  *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 179 (2d Cir. 2014) (citations and internal quotation marks omitted and emphasis removed).

 "Indemnity . . . entails the shifting of responsibility for any losses from the shoulders of one person to another. . . .  If it is determined that a . . . party was obligated to pay, that individual should be required to reimburse the party who carried its burden."  *SCAC Transp. (USA) Inc. v. S.S. Danaos*, 845 F.2d 1157, 1164 (2d Cir. 1988) (citations and quotation marks omitted).  An

indemnitee can recover against an indemnitor for a litigation settlement under an indemnification agreement. *See Atl. Richfield Co. v. Interstate Oil Transp. Co.*, 784 F.2d 106, 113 (2d Cir. 1986). So if an indemnitor must indemnify an indemnitee in a case, the indemnitee must give the indemnitor the opportunity to approve the settlement or defend the case. *Id.* If "the indemnitor [then] declines [to do] either . . .[,] the indemnitee is required to prove only its potential liability to the plaintiff" in the action. *Id.* But "[w]here notice—which includes a meaningful opportunity to assume the defense—is lacking, a demonstration of actual liability is required." *Id.*; *see also Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1216-17 (5th Cir. 1986).

"Express warranties may also give rise to a right to indemnification in maritime law." *In re M/V MSC Flaminia*, 339 F. Supp. 3d 185, 244 (S.D.N.Y. 2018). "A warranty is an assurance by one party to a contract of the existence of a fact upon which another party may rely," and "amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Id.* at 244-25 (quoting *Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.)). "[T]he right to indemnification depends only on establishing that the warranty was breached." *Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 644 (S.D.N.Y. 1999) (quoting *CBS v. Ziff-Davis Pub. Co.*, 553 N.E.2d 997, 1001 (N.Y. 1990)).

**B. Applicability of the Bill of Lading's Terms and Conditions**

Airlift USA raises a threshold issue concerning whether the Bill of Lading's terms and conditions apply to the dispute. Deft. Br. at 4-7. Airlift USA contends that the parties "only contracted for services involving the ocean transportation from the port in India to the port in the United States." *Id.* at 5. In making this argument, Airlift USA points to the following language in the Bill of Lading:

> Received by the Carrier . . . the . . . Containers . . . for carriage subject to all the terms and conditions hereof from the Place of Receipt or Port of Loading to the

> Port of Discharge or Place of Delivery, whichever is applicable.  In accepting this bill of lading the Merchant expressly accepts and agrees to all the terms and conditions . . . on this side and on the reverse side of this bill of lading.

R. 16 (capitalization changed).  Airlift USA urges the Court to read this language to mean that the Bill of Lading's terms expired once the cargo reached "the Port of Discharge or Place of Delivery," *i.e.*, the port in New York City.  Deft. Br. at 4-7.  And because Diver was injured after the goods left that port, Airlift USA reasons that it cannot be liable.  MSC, on the other hand, reads "from the Place of Receipt or Port of Loading to the Port of Discharge or Place of Delivery" to describe the "carriage," not to limit the applicability of the "terms and conditions."  Pl. Reply at 4-5.  In other words, MSC argues that this language merely states that MSC has received the cargo for transportation from one location to another, with MSC and Airlift USA remaining bound by the Bill of Lading's various terms and conditions.

The plain terms of the Bill of Lading support MSC's reading.  The first sentence of the above-quoted provision references MSC's obligation to provide carriage of the cargo "from the Place of Receipt or Port of Loading [*i.e.*, India] to the Port of Discharge or Place of Delivery [*i.e.*, New York City], whichever is applicable."  R. 16.  It does not, however, terminate the terms of the Bill of Lading, including any indemnification obligation on the part of Airlift USA, upon the cargo's arrival at the port in New York City.  That reading is reinforced by the next sentence, which states that the Merchant, which includes Airlift USA, "accepts and agrees to all the terms and conditions" of the Bill of Lading.  R. 16 (capitalization changed).  Certain of those agreed-upon terms plainly cover events that would occur outside of the period of delivery to the port in New York.  For example, under clauses 11.1 and 11.3 of the Bill of Lading, if MSC does not pack a container itself, the Merchant must inspect, pack, and seal the container before the cross-ocean transportation.  R. 26-27.  And clauses 14.8 and 14.9 require the Merchant to return containers and

equipment to MSC in good condition after completing the trans-Atlantic voyage. R. 29. Similarly, clause 20.4 requires the Merchant to indemnify MSC for costs incurred for the cleaning and disposal of shipped goods refused or abandoned by the Merchant.   R. 32.   Such refusal or abandonment would of course occur after the cargo arrives at the port.

These clauses regulate conduct outside of the period of carriage "from the Place of Receipt or Port of Loading to the Port of Discharge or Place of Delivery," and Airlift USA's reading would nullify them. A court should be "reluctant to read any clause as superfluous," and should be "guided by the axiom that 'a maritime contract should be interpreted so as to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.'" *Caterpillar Inc. v. M/V KARONGA*, No. 06 Civ. 8236 (NRB), 2008 WL 1849771, at *6 (S.D.N.Y. Apr. 23, 2008) (quoting *Mannesman Demag Corp. v. M/V Concert Express*, 225 F.3d 587, 594 (5th Cir. 2000) (alterations omitted)). Moreover, while Airlift USA points to the legal doctrine of *contra proferentem*, which instructs that an ambiguous clause should be interpreted against the drafter, Deft. Br. at 4, 7, that principle does not apply when the contract lacks ambiguity, *see Sompo Japan Ins. Co. of Am.*, 762 F.3d at 179. The unambiguous terms of the Bill of Lading contemplate obligations on the part of Airlift USA occurring after MSC's delivery.

## C.  Clause 11 of the Bill of Lading

Having determined that the obligations of the Bill of Lading persist after completing the trans-Atlantic voyage, the Court turns to the meaning of clauses 11.2 and 11.4. The parties dispute three questions:  (1) whether personal injury liability arising from the packing of cargo falls within the scope of the identification agreement; (2) whether the injury to Diver was caused by the poor packing of the goods; and (3) whether MSC was potentially liable to Diver for his injuries and, if

so, whether Airlift USA declined to indemnify MSC or assume its defense despite a meaningful opportunity to do so. If the answer is affirmative to all, Airlift USA must indemnify MSC under the Bill of Lading.

### 1. Personal Injury Liability

Airlift USA argues that the indemnity language in clause 11.4 does not cover personal injury because it references clause 11.2 and that provision applies only to the loss of or damage to goods. Deft. Br. at 9-11. But the relevant language of these clauses is broader than that. First, clause 11.4 requires Airlift USA to indemnify MSC "against any loss, damage, liability or expense whatsoever and howsoever arising caused by one or more of the matters referred to in clause 11.2, including but not limited to damage to Container, other cargo and the Vessel." R. 27. Thus, the only limitation is that the "loss, damage, liability or expense" must have been caused by a *matter* identified in clause 11.2.

While clause 11.2 instructs that MSC is "not liable for loss of or damage to the Goods," the actual "matters" referenced in that clause are wider. As significant here, clause 11.2(a) covers "the manner in which the Goods have been packed, stowed, stuffed or secured in the Container." R. 26. That the scope of indemnity under clause 11.4 goes beyond "loss of or damage to the Goods" is confirmed by the language of clause 11.4 itself, which extends to "matters referred to in clause 11.2, *including but not limited to damage to the Container, other cargo and the Vessel.*" R. 27 (emphasis added). Damage to a container, other cargo, and the vessel would not constitute "loss of or damage to the Goods." Thus, a plain reading of sections 11.4 and 11.2(a) reveal that Airlift USA's indemnification obligation extends not just to the loss of or damage to the cargo, but

to "any . . . liability . . . whatsoever and howsoever arising caused by" "the manner in which the Goods have been packed, stowed, stuffed or secured in the Container." R. 26-27.[7]

Nor is the Court persuaded by Airlift USA's arguments that this interpretation would do violence to public policy. Deft. Br. at 11. Even putting aside the express language of the Bill of Lading, discussed above, the purported public policies cited by Airlift USA hardly compel its proposed construction. For instance, Airlift USA provides no authority or support for its argument that indemnification for personal injuries would be unconscionable under these circumstances. Deft. Br. at 10. And while Airlift USA points to principles of the common law of indemnity, *see id.*, these principles are not relevant to a dispute that concerns contractual indemnity. *See Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 834 (5th Cir. 1992) (explaining that under maritime law, express indemnities, as opposed to other types, are simply interpreted using "[t]he usual rules of contract[] interpretation"). Airlift also argues that MSC cannot disclaim the duty of seaworthiness, Deft. Br. at 11-12, but MSC does not seek indemnification arising from a breach of the duty, R. 1-15. Airlift USA also does not explain why MSC's interpretation would conflict with the International Maritime Organization's Convention on Safe Containers. *See* Deft. Br. at 11. Even if the Convention requires owners of containers to maintain them in safe condition, at issue here is the separate question of whether the Bill of Lading indemnifies MSC for personal injuries caused by poorly packed cargo.

Therefore, personal injury liability arising from the poorly packed slabs is within the scope of the indemnity agreement.

---

[7] Here too, because the contractual language lacks ambiguity, Airlift USA's resort to the principle of *contra proferentem*, Deft. Br. at 8, is unavailing. *See Sompo Japan Ins. Co. of Am.*, 762 F.3d at 179.

2.  **The Cause of Diver's Accident**

The next question is closely related: whether the cause of Diver's accident falls within the Bill of Lading's indemnity provision at clause 11.4.  This question turns on whether MSC's liability to Diver was "caused by one or more of the matters referred to in clause 11.2," namely, "the manner in which the Goods have been packed, stowed, stuffed or secured in the Container." R. 26-27.  If Diver's injury was not caused by the poor packing of the container, MSC's liability to Diver would fall outside the scope of the indemnification agreement.[8]

The Court finds that the poor packing of the container was both a but-for and a proximate cause of the accident.  Every witness, including two experts, in the New Jersey case on whose testimony the parties rely—Diver, Dr. Singh, and Captain Anderson—identified the poor packing of the granite slabs as a major cause of the accident.  Airlift USA provides no argument to the contrary.  While it correctly points out that Diver and Dr. Singh also blamed a poorly constructed floor, Deft. Br. at 14-15, Dr. Singh also extensively opined on the bundles' deficient packing. Indeed, Dr. Singh's initial report did not even discuss the floor as a cause, finding only that "[t]he damage [was] directly attributable to the negligence of the defendant in the use of packaging and load securement." R. 966.  And unlike the deficiencies in the packing, whether there were flaws with the container floor is disputed, as Captain Anderson and Dines denied that the flooring was dangerous.  Moreover, Airlift USA argues elsewhere that MSC could have avoided liability by discrediting Dr. Singh, whose testimony Airlift USA views as "susceptible to attack" under the "threshold for expert testimony," R. 1171-73, thus undermining the only expert who embraced the

---

[8] Though the parties did not brief the issue, "the word 'cause' has many meanings and shades of meanings." *State Mut. Life Assur. Co. v. Heine*, 141 F.2d 741, 746 (6th Cir. 1944). Because the Court finds that the flawed packing of the stone slabs was both the but-for and the proximate cause of the accident, meeting even the stricter definition of "cause," resolving this interpretive question is unnecessary.

floor theory. Nor does the evidence related to the chassis failure undermine the Court's conclusion. The only witness who cited the chassis failure, Captain Anderson, considered it only as a factor that aggravated the preexisting problem caused by the slabs' loose packing.

### 3. MSC's Potential Liability

When, as here, litigation falls within the scope of an indemnity provision, and the indemnitor does not defend the indemnitee or approve the indemnitee's settlement despite a meaningful opportunity to do so, the indemnitee may recover the settlement from the indemnitor so long as the indemnitee was potentially liable in the case. *See Atl. Richfield Co.*, 784 F.2d at 113.

First, Airlift USA was afforded a meaningful opportunity to approve the settlement or defend the New Jersey case. Airlift USA was a defendant in the New Jersey litigation for the year before the settlement, with its counsel attending depositions, receiving documents produced in discovery, and attending multiple settlement conferences. Stipulated Facts ¶¶ 7, 25; Donatelli Decl. ¶ 13. On March 5, 2020, after MSC reached a proposed settlement with Diver, MSC's counsel advised Airlift USA's counsel of the proposed settlement and gave counsel until March 10, 2020 to approve the settlement or take over MSC's defense. Stipulated Facts ¶ 28. Airlift USA declined to do either. After Airlift USA's counsel advised MSC's counsel that Airlift USA rejected those options, Stipulated Facts ¶ 30; R. 1171-72, MSC entered into the settlement agreement with Diver and paid the agreed-upon amounts, R. 1176-77; Stipulated Facts ¶¶ 32-33.

Second, MSC has met its burden of showing its potential liability in the New Jersey litigation. That potential liability is established by the conflicting testimony on whether the container floor was defective, and, if so, whether that defect played a role in the injury. While MSC disputed that there were any flaws in the container's floor giving rise to liability, it could

have lost on that argument at trial, especially given the testimony of Diver and Dr. Singh on the subject.[9]  The anticipated testimony from those witnesses would have allowed a jury to conclude that MSC was liable for negligent maintenance of the container floor.  If the jury found MSC to be at least sixty percent liable, MSC would also have been liable for the damages owed by all defendants.  *See* N.J. Rev. Stat. § 2A:15-5.3.

Airlift USA's briefing on this question is in two minds.  On the one hand, it argues that MSC was *actually* liable to Diver because of its "negligent, reckless, and careless conduct" related to the maintenance of the container floor.  Deft. Br. at 9.  On the other hand, it argues that MSC's potential liability was illusory, and resulted from an inept litigation strategy.  Deft. Proposals ¶¶ 16, 19.  But if Airlift USA was not satisfied with MSC's settlement, it had a solution at hand: to take over the defense, then attempt to collect other contributors' shares later, as MSC did.

Airlift USA also argues that insofar as MSC's potential liability stemmed from its own negligence, it was outside of the scope of the indemnity agreement.  Under federal maritime law, an "indemnity clause 'will not be construed to indemnify a person against his own negligence unless such intention is expressed in unequivocal terms.'"  *Capozziello v. Brasileiro*, 443 F.2d 1155, 1157 (2d Cir. 1971) (quoting *Rice v. Penn. R. Co.*, 202 F.2d 861, 862 (2d Cir. 1953)).  Airlift USA's argument encounters two problems.  First, as explained above, MSC paid a settlement for damages that contemplated liability caused by the packing of the granite slabs in the container, not only its own activity.  While MSC may have been found liable had the case proceeded to trial based on the condition of the container floor, this Court has found that the poor packing of the slabs caused Diver's injuries.  And second, the indemnity agreement *does* indemnify MSC for

---

[9] The container was owned by a company that sub-leased it to a second company, which in turn sub-leased the container to MSC.  Stipulated Facts ¶ 19.  Under that sub-lease, MSC was responsible for the maintenance and repair of that container.  *Id.* ¶ 20.

damages resulting from its own negligence.  "The Supreme Court has expressly declined to require, as indicia of an intent to indemnify a party against the consequences of his own negligence, an express provision to that effect."  *Capozziello*, 443 F.2d at 1158 (citing *United States v. Seckinger*, 397 U.S. 203, 212-13 n.17 (1970)).  Accordingly, a contract providing for indemnification for "all losses on any claims" indemnifies the indemnitee for the indemnitee's negligence.  *Id.* at 1158 (quoting *Moses-Ecco Co., Inc. v. Roscoe-Ajax Corp.*, 320 F.2d 685, 688 (D.C. Cir. 1963)) (internal quotation marks omitted).  Since clause 11.4 contains substantially similar language—covering "any loss, damage, liability or expense whatsoever and howsoever arising"—it indemnifies MSC for its own negligence.

\* \* \*

In sum, because personal injury liability caused by poor packing of cargo is covered by the Bill of Lading's indemnity agreement, Diver's injury was caused by the poor packing of the goods and thus was within the contractual scope of the indemnity agreement, and MSC was potentially liable to Diver yet Airlift USA failed to defend it or approve its settlement despite a meaningful opportunity to do so, Airlift USA must indemnify MSC under clauses 11.4 and 11.2(a) of the Bill of Lading.

## D.  Clause 14.3

MSC argues in the alternative that Airlift USA bears liability under clause 14.3 of the Bill of Lading.  Under this provision, Airlift USA warranted that "the Goods are safely and securely packed in the Container."  R. 28.  The Court's findings as to clauses 11.4 and 11.2(a) with respect to indemnification, particularly as to the poor packing of the granite slabs in the container, apply with equal force to warranty language of clause 14.3.  Airlift USA warranted that the container was properly packed, which was not the case, and thus Airlift USA had to indemnify MSC for any

resulting loss under the warranty in clause 14.3. *See Metro. Coal Co.*, 155 F.2d at 784. Airlift USA does not argue that clause 14.3 raises any legal issues different from those arising under clauses 11.4 and 11.2. *See* Deft. Proposals; Deft. Br.; Deft. Reply.

### E. Damages

MSC seeks to recover the value of the settlement, its attorneys' fees and costs, and prejudgment interest. Pl. Proposals at 31. The Complaint in this action, filed while the New Jersey litigation was ongoing, sought only a declaration that damages were owed, not specific amounts of damages. Complaint at 5. Since the New Jersey litigation has concluded and MSC now seeks specific amounts of damages, the relief MSC seeks has changed. Airlift USA does not object. *See* Deft. Reply; Dkt. 109, Exh. 1 at 2 (email from MSC's counsel memorializing understanding with Airlift USA's counsel that the nature of the action changed due to the progress of the New Jersey litigation). "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2).

MSC settled the New Jersey litigation for a total of $755,000, paid in part to Diver and in part to Diver's worker's compensation carrier. Stipulated Facts ¶¶ 32-33. For reasons given above, MSC is entitled to recover that sum from Airlift USA.

MSC also seeks $133,692.81 in attorneys' fees and costs for defending the New Jersey action based on a lodestar calculation. Pl. Proposals ¶ 100; Donatelli Decl. at 5. "Indemnity obligations, whether imposed by contract or by law, require the indemnitor to hold the indemnitee harmless from costs in connection with a . . . claim[]. Legal fees and expenses incurred in defending an indemnified claim are one such cost and thus fall squarely within the obligation to indemnify . . . unless the agreement explicitly says otherwise." *Peter Fabrics, Inc. v. S.S. Hermes*,

765 F.2d 306, 316 (2d Cir. 1985) (Friendly, J.); *accord SCAC Transport (USA) Inc.*, 845 F.2d at 1164 ("[I]t is clear that indemnity in admiralty includes litigation expenses.").

    In determining a reasonable hourly rate, courts look to what a "reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." *Bergerson v. New York State Off. of Mental Health, Cent. New York Psychiatric Ctr.*, 652 F.3d 277, 289 (2d Cir. 2011) (quotation marks omitted). To establish that rate, the Court looks to "the prevailing market rate, i.e., the rate prevailing in the relevant community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Farbotko v. Clinton Cty. of New York*, 433 F.3d 204, 208 (2d Cir. 2005) (quotation marks and alteration omitted).

    Airlift USA does not contend that MSC's fees are unreasonable or that MSC is not entitled to fees should it succeed on the merits. *See* Deft. Reply. The Court has reviewed the declaration of MSC's attorney, Randolph Donatelli, describing the hours billed in the matter and the rates charged, and finds them to be reasonable. *See* Donatelli Decl. The work of MSC's attorneys included conducting discovery that included participating in eight depositions and preparing the case for trial, with the settlement reached just seven weeks before trial was scheduled to begin; attending six in-person court conferences; attending three in-person settlement conferences with the court, one in-person settlement conference with a private mediator, and one arbitration; and drafting and filing a summary judgment motion. *Id.* ¶¶ 6-12. The Court also finds reasonable Mr. Donatelli's hourly rate of between $315 and $330 given his extensive experience in maritime matters, as well as his associates' hourly rates of between $145 and $250, and the $350 hourly rate for a colleague with 40 years of litigation experience who billed limited time on the case. *Id.* ¶¶ 21-22; *see Billybey Marina Servs., LLC v. Bouchard Transportation Co.*, No. 20 Civ. 4922

Case 1:18-cv-10788-JPC-OTW   Document 117   Filed 01/13/22   Page 23 of 24

(LTS), 2021 WL 4950835, at \*3 (S.D.N.Y. Oct. 25, 2021) ("In maritime cases, the Southern District has approved a wide range of hourly rates, often within the $300-$500 range."). The Court also finds reasonable the requested total disbursement of $7,317.81, which includes the costs of deposition and court hearing transcripts, filing fees, the private mediator's fee, travel costs, and Captain Anderson's fee. *Id.* ¶ 23.

Finally, MSC seeks prejudgment interest. "Prejudgment interest is normally awarded in maritime cases," and "the rate of interest to be applied is a matter within this Court's discretion, as is the date when the interest accrues, and whether interest is to be compounded." *Great Lakes Bus. Tr. v. M/T Orange Sun*, 855 F. Supp. 2d 131, 155 (S.D.N.Y. 2012) (citations omitted), *aff'd*, 523 F. App'x 780 (2d Cir. 2013). "The purpose of prejudgment interest is solely compensatory and to make the party whole," and interest "must not result in over-compensation to the plaintiff." *In re Complaint of Moran Towing Co.*, 996 F. Supp. 2d 221, 224-25 (S.D.N.Y. 2014) (citations and quotation marks omitted). Rates used have included the statutory rate of the forum state, the average prime rate, and the short-term Treasury Bill rate. *See Great Lakes Bus. Tr.*, 855 F. Supp. 2d at 155-56 (collecting cases). MSC completed payment of the settlement on July 1, 2020, Stipulated Facts ¶ 33, and Airlift USA suggests no alternative date for the calculation to begin, *see* Deft. Reply. Throughout the relevant period, the prime rate has been 3.25%. *Money Rates*, The Wall Street Journal, https://www.wsj.com/market-data/bonds/moneyrates (last visited Jan. 4, 2022). The Court thus awards prejudgment interest from July 1, 2020 to the date of this Order at 3.25%, without compounding, which calculates to $44,392.03. *See Great Lakes Bus. Tr.*, 855 F. Supp. 2d at 157 (adopting the same metric for calculating prejudgment interest).

### III.  Conclusion

The Court therefore awards MSC a total of $888,692.81 in damages, which includes attorneys' fees and disbursements for defending the New Jersey action, plus $44,392.03 in prejudgment interest as explained above.


SO ORDERED.

Dated: January 13, 2022
     New York, New York

JOHN P. CRONAN
United States District Judge